**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **NUTRIBAND, INC.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**RAYMOND KALMAR,**<br>**PAUL MURPHY,**<br>**MICHELLE POLLY-MURPHY,**<br>**ADVANCED HEALTH BRANDS, INC., and**<br>**TD THERAPEUTIC, INC.,**<br><br>**Defendants.** | **Civil Case No:**<br><br>**COMPLAINT**<br><br>**ECF Case**<br><br>**Jury Trial Demanded** |

Plaintiff, Nutriband, Inc. ("**Nutriband**" or "**Company**"), for its Complaint against Raymond Kalmar ("**Kalmar**"), Paul Murphy ("**Murphy**"), and Michelle Polly-Murphy ("**Polly-Murphy**") (together, "**Individual Defendants**") and against Advanced Health Brands, Inc. ("**Advanced Health**") and TD Therapeutic, Inc. ("**TD Therapeutic**") (together, "**Corporate Defendants**"), (collectively, "**Defendants**"), alleges as follows:

## SUMMARY OF THE ALLEGATIONS

1. Plaintiff Nutriband brings this securities fraud action seeking redress from Defendants who fraudulently and deceitfully obtained 5 million shares of Nutriband's common stock. The 5 million shares have a current market value of $47 million.

2. The Defendants' scheme to defraud Nutriband was brazen and targeted. The scheme began with an unsolicited December 4, 2016, email from Defendant Kalmar to Nutriband seeking a "partnership" between Nutriband and what Kalmar described as his two transdermal patch companies—Advanced Health and TD Therapeutic.

3. From this very first communication, and over the course of the next several months, the Individual Defendants (on their behalf and on behalf of the Corporate Defendants) knowingly and intentionally made materially false and misleading statements and omissions in telephone calls and in emails about important aspects of the Corporate Defendants' business and operations in an effort to fraudulently induce Nutriband to hand over valuable shares of the Company in exchange for a partnership with the Corporate Defendants.

4. For example, Defendants fraudulently misrepresented that the Corporate Defendants (i) had a "team" of independent sales representatives promoting into "thousands" of stores and pharmacies across the country, (ii) were on the brink of closing a "deal" with the big-box retailer Home Depot to sell over 1.2 million transdermal insect repellent patches, (iii) employed a chief financial officer (CFO) to handle the finances and accounting of the companies, and (iv) had three "DBAs" [doing business as units] with an existing customer base: one DBA for wholesaling bulk chemical products, one DBA for constructing FDA cleanrooms, and one DBA for performing chemical laboratory testing services. Yet, at the time these statements were made, Defendants knew that none of these representations about the Corporate Defendants was true.

5. Perhaps just as troubling as the blatant misrepresentations about the Corporate Defendants' business, was Defendant Kalmar's concealment of his extensive criminal history for fraud and dishonesty. When Kalmar discussed with Nutriband his professional experience in the pharmaceutical industry and thus his qualifications to serve on Nutriband's board of directors, he never disclosed his multiple criminal convictions for passing bad checks in at least three different states. Had Nutriband known about Kalmar's criminal history, it would never have considered him fit to serve on the Company's board of directors.

6. In reliance upon Defendants' false statements and omissions touting the Corporate Defendants as, among other things, companies with an existing sales team, an imminent deal with Home Depot, real business lines with an existing customer base, and a full management team with a CFO, Plaintiff entered into a Share Exchange Agreement (the "**Agreement**") with Defendants in May 2017. Under the Agreement, Nutriband issued and delivered a total of 5 million shares of Nutriband's common stock, representing 24% of the Company, to the Individual Defendants and two individuals, referred to herein only as "**Person No. 1**" and "**Person No. 2**." Also pursuant to the Agreement, Defendants Kalmar and Murphy were appointed to Nutriband's board of directors.

7. In exchange, Nutriband expected to receive—but in fact never received—all of the shares of stock in the Corporate Defendants (representing 100% ownership of the two companies) and their assets, which included Advanced Health's portfolio of transdermal patch intellectual property (the "**IP**").

8. It was only after the closing of the Agreement that Nutriband had access to information exposing that the business and operations of the Corporate Defendants were a far cry from what Defendants had represented during the negotiations leading up to the stock share exchange. In fact, contrary to what Defendants had represented, the Corporate Defendants did not have a sales team, did not have an imminent deal with Home Depot, did not have any DBA business units, did not have an existing customer base, and did not have a CFO working for the companies.

9. Put simply, Defendants duped Nutriband into handing over 5 million shares of its stock—currently worth $47 million—and 24% of the Company in exchange for a "house of cards." Nutriband now seeks to hold Defendants jointly and severally liable for it losses, damages, and injuries resulting from the fraud.

## JURISDICTION AND VENUE

10. Plaintiff's claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and common law fraud.

11. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, the mails and interstate telephone and email communications.

12. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the Plaintiff alleges claims under the federal securities laws. The Court has supplemental jurisdiction over the common law fraud claim pursuant to 28 U.S.C. § 1367 because it is part of the same case or controversy as the federal securities law claims. The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000.

13. The Court has personal jurisdiction over each Defendant pursuant to Section 27(a) of the Exchange Act, which provides for nationwide service of process within the United States for actions alleging violations of the federal securities laws and because Defendants had minimum contacts with the State of New York for the purposes of this action. For example, the Individual Defendants each hold shares of Nutriband stock which trades on the OTCQB Venture Market sponsored by The OTC Market Group Inc., which is located in New York, New York. Moreover, the Individual Defendants received delivery of their Nutriband stock certificates from the Company's transfer agent, First American Stock Transfer, Inc., which is located in Brooklyn, New York.

14. Venue is proper in the District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in this District. For example, Defendants'

fraudulent acts and deception resulted in Nutriband's transfer agent, located in Brooklyn, New York, preparing, issuing, and delivering Nutriband stock certificates to the Individual Defendants and others.

## PARTIES

*Plaintiff*

15. Plaintiff Nutriband is a Nevada corporation with its primary place of business in the State of Florida. Nutriband is principally engaged in the development of a portfolio of transdermal pharmaceutical products. Nutriband is a publicly traded company that trades on the over-the-counter market OTCQB Venture Market under the trading symbol "NTRB." At the time of the Complaint, Nutriband's stock was trading at a price $9.43 per share.

*Corporate Defendants*

16. Defendant Advanced Health was at all times relevant to the allegations herein a Michigan corporation with its primary place of business in the State of Michigan. On February 18, 2018, Defendant Kalmar caused a certificate of dissolution for Advanced Health to be filed with the Michigan Secretary of State.

17. Defendant TD Therapeutic is a Michigan corporation with its principal place of business in the State of Ohio.

*Individual Defendants*

18. Defendant Kalmar is a natural person and a resident of the State of Ohio. At all relevant times, Kalmar was an officer and controlling shareholder of Advanced Health and TD Therapeutic, and he held himself out to Nutriband as the CEO of these companies. The corporate filings for the Michigan Secretary of State list Kalmar as the President and Secretary of Advanced Health and also list him as the President of TD Therapeutic. In a business plan for TD Therapeutic

that Kalmar sent to Nutriband, Kalmar is referred to as the Founder, President and Chief Executive Officer of the company.

19. Defendant Murphy is a natural person and a resident of the State of Michigan. At all relevant times, Murphy was an officer and controlling shareholder of Advanced Health and TD Therapeutic. The corporate filings for the Michigan Secretary of State list Murphy as the Treasurer and Director of Advanced Health and also list him as the Vice President, Secretary, Treasurer, and Director of TD Therapeutic. In a business plan for TD Therapeutic that Kalmar sent to Nutriband, Murphy is referred to as the Executive Chairman and Chief Operations Officer of the company.

20. Defendant Polly-Murphy is a natural person and a resident of the State of Ohio. At all relevant times, Polly-Murphy held herself out to Nutriband as an officer and controlling shareholder of Advanced Health and TD Therapeutic. Specifically, Polly-Murphy held herself out to Plaintiff as the Chief Legal Officer or General Counsel of Advanced Health. In a business plan for TD Therapeutic that Kalmar sent to Nutriband, Polly-Murphy is referred to as the General Counsel and Chief Legal Officer of the company.

## FACTUAL ALLEGATIONS

### A. Nutriband's Transdermal Patch Business

21. Nutriband's CEO, Gareth Sheridan ("**Sheridan**"), founded its predecessor company, Nutriband Ltd. (Ireland), in Dublin, Ireland in 2012.

22. Nutriband Ltd. (Ireland) sought to enter the health supplement market with new applications of transdermal skin patches for the delivery of nutritional health supplements. The patches adhere to the skin and the ingredients pass through the skin over a period of time. The patches are intended to be an alternative to receiving the health supplements orally by having to swallow tablets or capsules.

23. In January 2016, Nutriband Ltd. (Ireland) was acquired by Nutriband and the operations moved to the United States. The Company redeveloped its product line in 2016 to consist of a multivitamin patch, an energy patch, and a weight management patch. The ingredients in these three patches contained generally available, over-the-counter nutritional health supplements: the multivitamin patch contained Vitamin C, D, and E; the energy patch contained caffeine and Vitamins B12 and B6; and the weight management patch contained green tea extract and raspberry ketone.

24. The original Nutriband patches did not contain any pharmaceutical ingredients, such as drugs or medicine. Rather, Nutriband's product line in 2016 was limited to just cosmetic and dietary transdermal patches. Therefore, when the Defendants solicited Nutriband and offered an opportunity to partner with companies that had IP and transdermal patches containing pharmaceutical ingredients, Nutriband considered the offer to be a great opportunity to expand its business and product lines.

**B. Defendants Make Materially False And Misleading Statements To Induce Nutriband To Enter Into A Partnership With The Corporate Defendants**

**a. Kalmar Falsely States That His Companies Have A "Team" Of Independent Sales Reps Promoting Into "Thousands" Of Stores And Pharmacies**

25. On December 4, 2016, Kalmar sent an unsolicited email to Nutriband inquiring whether Nutriband was interested in entering into a "partnership" with Kalmar's two companies, Advanced Health and TD Therapeutic.

26. Kalmar's email was addressed, "To Whom It May Concern." In his email, Kalmar described his businesses as follows: "We [Advanced Health] are a United States based consumer

healthcare product company along with our sister company TD Therapeutics Inc.[[1]] a small U.S. based pharmaceutical company." He further wrote, "Our primary focus is transdermal delivery of drugs, vitamins and minerals that help patients create a healthier more balanced lifestyle."

27. From this very first email, Kalmar misrepresented important information about the business of the Corporate Defendants in order to lure Nutriband into a partnership. For example, Kalmar falsely stated in the email that, "We [the Corporate Defendants] have a team of independent sales reps that promote into thousands of natural and health food stores as well as independent pharmacies across the United States waiting for our first consumer product."

28. Kalmar, on his own behalf and on behalf of the Corporate Defendants, knew (or was reckless in not knowing) that this statement was false when made. Upon information and belief, neither of the Corporate Defendants had any independent sales representatives working for them, let alone a "team" of independent sales representatives promoting into "thousands" of stores and pharmacies across the country. Indeed, after the closing of the Agreement, Defendants were unable to identify or introduce Nutriband to any independent sales representatives working for either of the Corporate Defendants.

29. Kalmar, on his behalf and on behalf of the Corporate Defendants, made the statement to deceive Nutriband into believing there was a sales force ready and able to start marketing Nutriband's transdermal patch products in order to induce Nutriband to enter into the stock share exchange with the Defendants.

30. The partnership discussions between Advanced Health and TD Therapeutic continued from there and were primarily but not exclusively between Kalmar and Nutriband's

[1] When communicating with Plaintiff, Defendants referred to the entity as "TD Therapeutics." According to the corporate records filed with the Michigan Secretary of State, the proper name of the corporate entity is "TD Therapeutic."

CEO Sheridan. Throughout these discussions, which were mostly but not exclusively by email, Kalmar continued to make further materially false and misleading statements about important aspects of Advanced Health and TD Therapeutic's business.

**b. Kalmar Falsely States That His Companies Have An Imminent "Deal" With Home Depot to Sell 1.2 Million Insect Repellent Patches**

31. As Nutriband continued discussions with Kalmar about a possible partnership, Kalmar tried to induce Nutriband's participation by falsely telling Nutriband's CEO Sheridan in email exchanges on December 16, 2016, that Advanced Health was on the brink of closing a "deal" with the big-box retailer Home Depot, and that Home Depot was ready to starting placing purchase orders for over 1.2 million insect repellent patches from Advanced Health.

32. Advanced Health's impending deal with Home Depot, as described by Kalmar, was a material part of the negotiation process for Nutriband. In an email dated December 16, 2016, Sheridan sought clarification on the status of this impending deal by writing, "I was under the impression [from prior communications with Kalmar] they [Home Depot] were ready to order and launch immediately and the only thing holding things up was because you were trying to find a suitable manufacturer . . . ." Kalmar sent an email response that same day stating, "Your impression [of the Home Depot deal] was correct, we were nearly ready to close the deal with Home Depot and due to manufacturing issues and timeliness running into late fall, early winter they decided to hold off until early 2017." In that same email exchange on December 16, 2016, Kalmar wrote, "[W]hile discussing the potential deal with Home Depot for insect repellant patches their initial order would have required a 1.2 million patch run to put together all the POS [purchase orders] boxes they wanted. We need the ability to run a minimum of a million patches in a week if needed."

33. Kalmar, on his own behalf and on behalf of the Corporate Defendants, knew (or was reckless in not knowing) that these statements were false and misleading at the time they were made. Upon information and belief, neither Advanced Health nor TD Therapeutic was anywhere near "ready to close" a deal with Home Depot to sell 1.2 million insect repellant patches. Indeed, after closing the Agreement in May 2017, Defendants were unable to identify or introduce to Nutriband anyone from Home Depot and never obtained any purchase orders for any insect repellent patches—or any other patch products for that matter—from Home Depot.

34. Kalmar, on his own behalf and on behalf of the Corporate Defendants, made these false statements to deceive Nutriband into believing that Advanced Health was on the brink of signing a major deal with a leading big-box retailer that would be mutually beneficial to Nutriband in order to induce Nutriband to enter into the stock share exchange with the Defendants.

**c. Kalmar Falsely States That His Companies Have A CFO**

35. Upon realizing that his knowingly false and misleading statements were successfully drawing Nutriband into further partnership discussions, Kalmar sent an email to Nutriband's CEO Sheridan, dated December 28, 2016, requesting that his management "team" be given a significant ownership interest in Nutriband, two board seats, and management positions at Nutriband for his "Chief Operations Officer, Chief Financial Officer, Chief Legal Officer and myself." In later emails with Nutriband, Kalmar identified Defendant Murphy as the Chief Operations Officer and Defendant Polly-Murphy as the Chief Legal Officer of the Corporate Defendants.

36. In these emails, Kalmar knowingly and intentionally misrepresented the management "team" for his two companies by falsely stating that the companies had a CFO in place as part of the management teams. Kalmar falsely claimed that the Corporate Defendants

employed Person No. 1 as their CFO. For example, in an email, dated January 19, 2017, Kalmar wrote, "[Person No. 1] [is] our CFO." Moreover, in the TD Therapeutic business plan that Kalmar sent Nutriband's CEO Sheridan by email on January 20, 2017, Kalmar identified Person No. 1 as TD Therapeutic's CFO.

37. Kalmar knew (or was reckless in not knowing) that these statements were false when made because Person No. 1 has never been employed by or otherwise worked for either of the Corporate Defendants—let alone acted as their CFO, as Kalmar represented.

38. Indeed, Person No. 1 recently told Nutriband's CEO Sheridan that although she knew Kalmar and had on occasion discussed the possibility of assisting him if his business ideas ever materialized into real operating businesses, she never agreed to act as the CFO for either Advanced Health or TD Therapeutic. In fact, Person No. 1 stated she was unaware that Kalmar had listed her as the CFO in a TD Therapeutic business plan, and that he did so without her permission and consent.

39. At all times relevant to the events alleged herein, Person No. 1 was employed full-time at a Fortune 500 global consulting and management firm and never performed any CFO related duties, or other job duties, for either of the Corporate Defendants.

40. Kalmar, on his behalf and on behalf of the Corporate Defendants, made the false statements to deceive Nutriband into believing that the Corporate Defendants had a full management team in place, including a CFO, that would be mutually beneficial to Nutriband in order to induce Nutriband to enter into the stock share exchange with the Defendants.

**d. Kalmar Falsely States That His Companies Have Three "DBA" Units, A Customer Base, And Millions of Dollars In Projected Sales Revenues**

41. As the discussions between Kalmar and Plaintiff Nutriband continued into January 2017, Kalmar told Nutriband that the Corporate Defendants operated through three business units,

or what he called the "DBAs." He identified the three DBAs as: (i) US Chemical Labs ("**US ChemLabs**"), (ii) US Cleanroom Concepts ("**US Cleanroom**"), and (iii) US BioLab Technologies ("**US BioLabs**"). In an email from Kalmar to Nutriband's CEO Sheridan, dated January 10, 2017, Kalmar wrote, "Hello Gareth, Understand that US Chem Labs, Us [sic] BioLabs and US Cleanroom Concepts work synergisticly [sic] as they use the same customer base."

42. Kalmar, on his own behalf and on behalf of the Corporate Defendants, knew (or was reckless in not knowing) that this statement was false and misleading when made. Upon information and belief, neither of the Corporate Defendants had any DBA business units—nor did they have any customer base or any customers. Indeed, after the closing of the Agreement in May 2017, Defendants were unable to identify or introduce Nutriband to any customers of the Corporate Defendants, and the business lines were not operational and did not generate any revenues.

43. Moreover, as discussed more fully below, Kalmar sent Nutriband's CEO Sheridan written summary descriptions of the three DBAs by email in January 2017. These descriptions contained materially false and misleading information about the three DBA business units and also included entirely made up financial sales projections that were not based on reasonable facts or investigation.

i. *The Phony US ChemLabs DBA And Sales Projections*

44. Kalmar, on behalf of the Corporate Defendants, made blatant misrepresentations to Nutriband about the US ChemLabs DBA business. For example, in the DBA description that Kalmar sent Nutriband's CEO Sheridan as an attachment to an email on January 10, 2017, Kalmar described the US ChemLabs DBA as a "[w]holesale bulk chemical business" that "can work directly with larger compounders to bring in exactly what customers need and plan quarterly to inventory needed bulk material to keep inventory turning." The DBA description also stated that

US ChemLabs' projected annual sales revenue was over $60 million. The DBA description stated, "The bulk chemical industry is approximately a $450m a year business. With our established contacts in this industry we anticipate taking a minimum of 15% of the market which is about $62m annually."

45. Kalmar also attached to the written DBA description several long lists identifying by name 2,659 companies throughout the U.S. where he and Defendant Murphy had contacts that would send them business. For the 2,659 companies that Kalmar claimed to have contacts, he projected a total of $62 million in expected sales revenue.

46. Kalmar, on his behalf and on behalf of the Corporate Defendants, knew (or was reckless in not knowing) that these statements about US ChemLabs were false and misleading when made. Upon information and belief, neither of the Corporate Defendants was engaged in the business of wholesaling bulk chemicals to customers. Moreover, the sales projection of $62 million from contacts at 2,659 companies was a false and misleading statement because, upon information and belief, Kalmar made it without any reasonable basis in fact or investigation.

47. Indeed, after the closing of the Agreement in May 2017, Defendants were unable to identify or introduce Nutriband to any customers for the US ChemLabs business, and the business line was not operational and did not generate any revenues.

48. Kalmar, on his own behalf and on behalf of the Corporate Defendants, made the false statements to deceive Nutriband into believing that the Corporate Defendants had a chemical wholesale distribution business and customers that would be mutually beneficial to Nutriband in order to induce Nutriband to enter into the stock share exchange with the Defendants.

*ii. The Phony US Cleanroom DBA And Sales Projections*

49. By email dated January 10, 2017, Kalmar also sent Nutriband's CEO Sheridan a written description of the US Cleanroom DBA, which stated that its business is constructing "[c]ontrolled environments for compounding, manufacturing, packaging & more." Kalmar represented that the US Cleanroom business line constructed FDA compliant cleanrooms.[2] In the same written description, Kalmar stated that the US Cleanroom "[s]ales potential is $200,000 for first year with a 50% profit margin."

50. Kalmar, on his behalf and on behalf of the Corporate Defendants, knew (or was reckless in not knowing) that these statements about US Cleanroom were false and misleading when made. Upon information and belief, neither of the Corporate Defendants was engaged in the business of constructing any such "controlled environments" or FDA compliant cleanrooms. Moreover, the sales projection of "$200,000 for first year" was a false and misleading statement because, upon information and belief, Kalmar made it without any reasonable basis in fact or investigation.

51. Indeed, after the closing of the Agreement in May 2017, Defendants were unable to identify or introduce Nutriband to any customers for the US Cleanroom business and this business line was not operational and did not generate any revenues.

52. Kalmar, on his own behalf and on behalf of the Corporate Defendants, made the false statements about US Cleanroom to deceive Nutriband into believing that they had a cleanroom business and customers that would be mutually beneficial to Nutriband in order to induce Nutriband to enter into the stock share exchange with the Corporate Defendants.

[2] Cleanrooms are controlled environments and spaces where manufacturers apply environmental controls to prevent contamination of the products, focusing primarily on limiting the concentration of particulates in the air. The U.S. Food and Drug Administration (FDA) publishes cleanroom standards for manufacturers of pharmaceutical products and medical devices.

*iii. The Phony US BioLabs DBA And Sales Projections*

53. Kalmar also sent Nutriband's CEO Sheridan written materials, attached to a January 10, 2017 email, describing the US BioLabs business as having a "chemistry department [that] provides quality compendial and non-compendial chemical analysis of raw materials and final product." Kalmar also sent Nutriband's CEO Sheridan an excel spreadsheet attachment to his January 10, 2017 email representing the expected monthly sales revenues for the US BioLabs business starting in August 2017 through July 2018, and totaling $1,793,000 for that one-year period.

54. Kalmar, on his behalf and on behalf of the Corporate Defendants, knew (or was reckless in not knowing) that these statements about the US BioLabs business were false and misleading because, upon information and belief, neither of the Corporate Defendants had a "chemistry lab" or was otherwise engaged in any business conducting chemical testing or analysis of any materials. Indeed, after the closing of the Agreement in May 2017, Defendants were unable to identify or introduce Nutriband to any customers for the US BioLabs business, and the business line was not operational and did not generate any revenues.

55. Moreover, the projected sales of $1,793,000 for the US BioLabs business was a false and misleading statement because, upon information and belief, Kalmar made it without any reasonable basis in fact or investigation.

56. Kalmar, on his own behalf and on behalf of the Corporate Defendants, made the false statements about US BioLabs to deceive Nutriband into believing that they had a chemical testing business and customers that would be mutually beneficial to Nutriband in order to induce Nutriband to enter into the stock share exchange with the Defendants.

57. Defendant Murphy also made false statements about the US BioLabs business. For example, in an email to Nutriband's CEO Sheridan, dated March 5, 2017, Murphy attached a written business description of the US BioLabs chemical testing business that falsely claimed that the Corporate Defendants had an existing customer base: "Utilizing our current customer base for chemicals [US ChemLabs DBA] and cleanrooms [US Cleanroom DBA], same customer base."

58. Murphy, on his behalf and on behalf of the Corporate Defendants, knew (or was reckless in not knowing) that his statement about the Corporate Defendants having a "current customer base" was false and misleading because, upon information and belief, neither of the Corporate Defendants had an existing customer base or was otherwise engaged in any business conducting chemical testing or analysis of any materials for any customers. Indeed, after the closing of the Agreement in May 2017, Defendants were unable to identify or introduce Nutriband to any customers for the US BioLabs business, and the business line was not operational and did not generate any revenues.

59. Defendant Murphy, on his own behalf and on behalf of the Corporate Defendants, made the false statements about the Corporate Defendants having an existing customer base to deceive Nutriband into believing that they had a US BioLabs business and customers that would be mutually beneficial to Nutriband in order to induce Nutriband to enter into the stock share exchange with the Defendants.

**e. Kalmar Fails To Disclose His Criminal History**

60. Throughout the discussions with Nutriband about a possible partnership, Kalmar requested that he and Murphy be appointed to Nutriband's board of directors. For example, in emails, dated December 28, 2016 and January 12, 2017, Kalmar sought Nutriband board seats for himself and Murphy.

61. In making this request, Kalmar made numerous representations about his professional experience in the pharmaceutical industry and thus his qualifications to be a member of Nutriband's board of directors. For example, in his first email to Nutriband's CEO Sheridan on December 4, 2016, Kalmar wrote, "Paul [Murphy] and I have over 25 years experience within the pharmaceutical, drug wholesale, and bulk chemical industries which comes with long term relationships." In another email to Nutriband's CEO Sheridan on December 16, 2016, Kalmar wrote, "[W]e have a lot of knowledge and experience that are true assets to help this business move forward . . . ."

62. Kalmar's statements about his professional industry experience and thus his qualifications to sit on the Nutriband board of directors were false and misleading because he omitted material information about his prior criminal history that rendered him unfit to sit on Nutriband's board.

63. Kalmar has numerous past criminal convictions for passing bad checks in several states, including North Carolina, South Carolina, and Florida. Kalmar's knowing omission of this important information about his prior criminal history and convictions made his statements about his industry experience and thus his qualifications to sit on Nutriband's board of directors, incomplete and inaccurate and therefore false and misleading. This is especially true because Kalmar's criminal history involves multiple convictions for crimes of dishonesty that rendered him unfit to serve on Nutriband's board of directors.

### C. The Parties Enter Into An Agreement Which The Individual Defendants Ignored By Failing To Transfer And Assign Their Stock Ownership And IP Portfolio

64. In reasonable reliance on Defendants' misstatements and omissions concerning material aspects of the Corporate Defendants' business, operations, and management and sales teams, among other things, Nutriband decided to enter into the Agreement.

65. Defendant Polly-Murphy drafted the Agreement on behalf of the Corporate Defendants and was responsible for addressing edits and comments as the parties negotiated the Agreement's terms and conditions.

66. The parties closed the Agreement on May 22, 2017. Pursuant to the Agreement, Nutriband issued (sold) 5 million shares of Company stock to the Individual Defendants and, at Kalmar's direction, to Person No. 1 and Person No. 2, who Kalmar claimed to be an early investor in his companies. Nutriband also appointed Kalmar and Murphy to seats on Nutriband's board of directors. In exchange, Kalmar, Murphy, and Polly-Murphy agreed to transfer and assign to Nutriband all of their shares of common stock of the Corporate Defendants.

67. After the closing, Nutriband directed its stock transfer agent, First American Stock Transfer, Inc., which is located in Brooklyn, New York, to prepare and deliver Company stock certificates to the Individual Defendants, as well as to Person No. 1 and Person No. 2. On or about late July or early August, 2017, the stock transfer agent prepared stock certificates for a total of 5 million shares of Nutriband stock, and issued the certificates as follows: 2.1 million shares to Kalmar; 2.1 million shares to Murphy; 500,000 shares to Polly-Murphy; 200,000 shares to Person No. 1; and 100,000 shares to Person No. 2.[3]

68. In June 2018, Nutriband learned for the first time that the Individual Defendants never executed the required corporate documents, or undertook any measures, to transfer and assign to Nutriband their stock ownership in the Corporate Defendants or the IP.

69. Specifically, on June 2, 2018, when preparing for meetings with financial advisors, Nutriband's CEO Sheridan learned that the IP was not in Nutriband's name, but rather was in

[3] Person No. 1 returned her 200,000 shares to Nutriband. Therefore, Plaintiff is seeking in this action the return of 4.8 million shares held by the Individual Defendants and Person No. 2.

Kalmar's name. Sheridan immediately emailed Kalmar and asked why the IP was not in Nutriband's name, but did not receive an adequate response.

70. Nutriband conducted a further inquiry into the matter and learned several more troubling things about its so-called partnership with Defendants following the closing of Agreement.

71. For example, Nutriband learned that it never became the legal owner of the Corporate Defendants and that the Individual Defendants had always maintained their ownership of the two companies. This meant that Nutriband was never the owner of the assets of the Corporate Defendants and was never the owner of the IP owned by Advanced Health.

72. Nutriband also learned that on or about February 8, 2018, Kalmar caused the corporate dissolution of Advanced Health with the Michigan Secretary of State, and in making that corporate filing he falsely represented in the filing that the shareholders had never been paid for their Advanced Health stock.

73. Nutriband also learned that after failing to assign the IP portfolio from Advanced Health to Nutriband, as required under the Agreement, Kalmar kept the IP in Advanced Health's name, allowed the IP to expire, and then, on or about March 9, 2018, he refiled the IP in his own name, for him personally and individually to own and control.

**D. Defendants Schemed To Defraud Nutriband**

74. Upon information and belief, the Individual Defendants, on their behalf and on behalf of the Corporate Defendants, schemed to defraud Nutriband out of the 5 million shares of Nutriband stock and 24% of the Company. Upon information and belief, the Individual Defendants never intended to transfer or assign to Nutriband their ownership interest in the Corporate Defendants or the assets of those companies, including the IP.

75. Given their respective roles at the companies, at all relevant times, the Individual Defendants were the corporate insiders of the Corporate Defendants and were intimately involved with the Corporate Defendants' day-to-day activities, to the extent there were any. The Individual Defendants also spoke frequently among themselves about Kalmar's ongoing discussions with Nutriband. For example, in an email dated March 5, 2017, to Nutriband's CEO, Defendant Murphy wrote: "It has been too long but Ray and I talk everyday [sic] and he has kept me in the loop." Therefore, Defendants Murphy and Polly-Murphy were aware of Kalmar's misrepresentations to Nutriband about the business and operations of the Corporate Defendants.

76. During the relevant period leading up to and after the Agreement in May 2017, Nutriband's CEO not only corresponded with the Individual Defendants by email, but he also spoke with the Individual Defendants by telephone. In particular, in telephone conversations with Nutriband's CEO, Defendants Murphy and Polly-Murphy perpetrated many of the same false statements and omissions about important aspects of the Corporate Defendants' business and operations that Kalmar perpetrated in his conversations and emails with Nutriband's CEO.

77. Plaintiff's information and belief that Defendants schemed to defraud it of the 5 million shares of Nutriband's stock is based on the fact that after the closing of the Agreement: (i) the Individual Defendants never executed the required corporate documents, or undertook any measures, to transfer and assign to Nutriband their stock ownership in the Corporate Defendants or the IP, thus proving that they were acting in concert with each other, and (ii) Kalmar caused the corporate dissolution of Advanced Health with the Michigan Secretary of State, allowed the IP to expire, and then refiled the IP in his own name, for him personally and individually to own and control.

**COUNT I**
**False Statement Liability**

(Section 10(b) of the Exchange Act and Rule 10b-5(b))

(As Against All Defendants)

78. Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

79. By reason of the conduct alleged above, each Defendant, directly or indirectly, in connection with the purchase or sale of securities (*i.e.*, the share exchange of Nutriband, Advanced Health, and TD Therapeutic's common stock), by the use of means or instrumentalities of interstate commerce or the mails, made untrue statements of material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

80. These misstatements include, but are not limited to:

a. The Corporate Defendants have a "team" of independent sales representatives promoting into "thousands" of stores and pharmacies across the country;

b. The Corporate Defendants have an imminent "deal" with Home Depot to sell 1.2 million insect repellant patches;

c. The Corporate Defendants have a CFO;

d. The Corporate Defendants have three "DBA" business units; and

e. The DBAs have a "current customer base."

81. Because Kalmar is the CEO of the Corporate Defendants, his misstatements and omissions of material fact are imputed to the Corporate Defendants.

82. Moreover, given their roles at the respective companies, at all relevant times, the Individual Defendants were the corporate insiders of the Corporate Defendants and were intimately involved with the Corporate Defendants' day-to-day activities, to the extent there were

any. As such, they are each liable for misstatements and omissions in the group documents published on behalf of the Corporate Defendants, *e.g.*, the TD Therapeutic business plan and the DBA business summaries. These misrepresentations and omissions include, but are not limited to, specific misstatements about each of the alleged DBA business lines and misrepresentations about the Corporate Defendants employing a CFO.

83. For the reasons set forth herein, all of the above statements were false when made.

84. Moreover, Kalmar omitted to disclose to Nutriband his criminal history of dishonest, fraudulent acts, which omission made Kalmar's statements about his professional industry experience and thus his qualifications to sit on Nutriband's board of directors to be fraudulently incomplete and misleading.

85. Defendants' misstatements and omissions of fact were material in that they were important to Nutriband's decision to enter into the Agreement and issue the 5 million shares of Company stock to the Individual Defendants and to Person No. 1 and Person No. 2, at Kalmar's direction. Indeed, these misstatements and omissions of fact would have been important to any reasonable investor's decision-making as they suggested (falsely) that the Corporate Defendants had, among other things, sound management, including a CFO, projected sales revenues and growth, and real business opportunities—when none of these were true.

86. Defendants acted with scienter in that they knew, or were reckless in not knowing, that these statements and omissions were untrue or misleading at the time they were made.

87. Because Kalmar is the CEO of the Corporate Defendants, his scienter is imputed to the Corporate Defendants.

88. Moreover, each of the Individual Defendants was a corporate insider of the Corporate Defendants and as such had the opportunity to commit fraud.

89. Each of the Individual Defendants also had a motive to commit fraud as each has benefitted in a personal, tangible way from the fraudulent inducement of Nutriband to enter into the Agreement. The Individual Defendants hold millions of shares of Nutriband stock and paid no consideration for the shares.

90. Nutriband reasonably relied on Defendants' false and misleading statements, omissions, and conduct in deciding to enter into the Agreement in May 2017, to issue the 5 million shares of stock to the Individual Defendants and to Person No. 1 and Person No. 2, and to appoint Kalmar and Murphy to the board of directors.

91. Had Nutriband known that Defendants' statements about the business of the Corporate Defendants as set forth herein were false and incomplete, Nutriband would not have entered into the Agreement, would not have issued 5 million shares of Company stock to the Individual Defendants and to Person No. 1 and Person No. 2, and would not have appointed Kalmar and Murphy to its board of directors.

92. The untrue statements and omissions of material fact made by Defendants caused Plaintiff to incur losses and damages in the amount of 5 million shares of Plaintiff's stock, with a current market value of $47 million, and the loss of 24% ownership interest in Nutriband.

93. The Corporate Defendants' stock, on the other hand, is essentially worthless because the Defendants disguised the very risks plaguing the Corporate Defendants, including, but not limited to, the Corporate Defendants' lack of a "team" of independent sales representatives, the Corporate Defendants' lack of an imminent "deal" with Home Depot, the Corporate Defendants' lack of a CFO, and the Corporate Defendants' lack of operating business units and an existing customer base. The materialization of these misrepresentations and omissions is what has rendered the Corporate Defendants' stock worthless and cost Nutriband substantial damages.

94. By engaging in the conduct alleged above, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b).

**COUNT II**
**Control Person Liability**

(Section 20(a) of the Exchange Act)

(As Against the Individual Defendants)

95. Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

96. As alleged herein, the Corporate Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b).

97. At all relevant times, the Individual Defendants were control persons of the Corporate Defendants for the purposes of Section 20(a) of the Exchange Act.

98. Specifically, at all relevant times, Kalmar was a controlling shareholder and officer of the Corporate Defendants. The corporate filings for the Michigan Secretary of State list Kalmar as the President and Secretary of Advanced Health and also list him as the President of TD Therapeutic. In a business plan for TD Therapeutic that Kalmar sent to Nutriband, Kalmar is referred to as the Founder, President and Chief Executive Officer of the company.

99. Moreover, at all relevant times, Murphy was a controlling shareholder and officer of the Corporate Defendants. The corporate filings for the Michigan Secretary of State list Murphy as the Treasurer and Director of Advanced Health and the Vice President, Secretary, Treasurer, and Director of TD Therapeutic. In a business plan for TD Therapeutic that Kalmar sent to Nutriband, Murphy is referred to as the Executive Chairman and Chief Operations Officer of the company.

100. Moreover, at all relevant times, Polly-Murphy held herself out to Nutriband as an officer of the Corporate Defendants. She specifically held herself out to Nutriband as the Chief

Legal Officer or General Counsel of Advanced Health and in a business plan for TD Therapeutic that Kalmar sent to Nutriband, Polly-Murphy is referred to as the General Counsel and Chief Legal Officer of the company.

101. Thus, at all relevant times, the Individual Defendants exercised power and control over the Corporate Defendants, including by directing and causing the direction of the management and policies of those entities, and by directing and participating in the acts constituting the violations of the securities laws alleged herein.

102. By reason of the foregoing, the Individual Defendants are liable as a control persons under Section 20(a) of the Exchange Act for the Corporate Defendants' violations of Section 10(b) of the Exchange Act and Rule 10b-5(b).

**COUNT III**
**Scheme Liability**

(Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c))

(As Against All Defendants)

103. Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

104. By reason of the conduct alleged above, Defendants, directly or indirectly, in connection with the purchase or sale of securities (*i.e.*, the share exchange of Nutriband, Advanced Health, and TD Therapeutic's common stock), by the use of means or instrumentalities of interstate commerce or the mails (i) employed devices, schemes, and artifices to defraud and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit on other persons.

105. Defendants' devices, schemes, and artifices to defraud and their acts, practices, or courses of business were material in that they were important to Nutriband's decision to enter into the Agreement and issue 5 million shares of Company stock to the Individual Defendants and to

Person No. 1 and Person No. 2. Indeed, these misstatements and omissions of fact would have been important to any reasonable investor's decision-making as they suggested (falsely) that the Corporate Defendants had, among other things, sound management, including a CFO, projected sales revenues and growth, and real business opportunities—when none of these were true.

106. Defendants acted with scienter in that they knew, or were reckless in not knowing, that they employed devices, schemes, and artifices to defraud and that they engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit on other persons.

107. Moreover, each of the Individual Defendants was a corporate insider of the Corporate Defendants and as such had the opportunity to commit fraud.

108. Each of the Individual Defendants also had a motive to commit fraud as each has benefitted in a personal, tangible way from the fraudulent inducement of Nutriband to enter into the Agreement. The Individual Defendants hold millions of shares of Nutriband stock and paid no consideration for the shares.

109. Nutriband reasonably relied on Defendants' false and misleading statements, omissions, and conduct in deciding to enter into the Agreement in May 2017, to issue the 5 million shares of stock to the Individual Defendants and the other two individuals, and to appoint Kalmar and Murphy to the board of directors. Had Nutriband known that that Defendants' statements about the business of the Corporate Defendants as set forth herein were false and incomplete, Nutriband would not have entered into the Agreement, would not have issued 5 million shares of Company stock to the Individual Defendants and to Person No. 1 and Person No. 2 at Kalmar's direction, and would not have appointed Kalmar and Murphy to its board of directors.

110. Defendants' devices, schemes, artifices and their acts, practices, and courses of business caused Plaintiff to incur losses and damages in the amount of 5 million shares of Plaintiff's stock, with a current market value of $47 million, and the loss of 24% ownership interest in Nutriband.

111. The Corporate Defendants' stock, on the other hand, is essentially worthless because the Defendants disguised the very risks plaguing the Corporate Defendants, including, but not limited to, the Corporate Defendants' lack of a "team" of independent sales reps, the Corporate Defendants' lack of an imminent "deal" with Home Depot, the Corporate Defendants' lack of a CFO, and the Corporate Defendants' lack of operating business units and an existing customer base. The materialization of these misrepresentations and omissions is what has rendered the Corporate Defendants' stock worthless and cost Nutriband substantial damages.

112. By engaging in the conduct alleged above, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

**COUNT IV**
**Common Law Fraud**

(As Against All Defendants)

113. Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

114. By reason of the conduct alleged above, Defendants made false and misleading statements and omissions about important aspects of the business of Advanced Health and TD Therapeutic.

115. These misstatements include, but are not limited to:

a. The Corporate Defendants have a "team" of independent sales representatives promoting into "thousands" of stores and pharmacies across the country;

b. The Corporate Defendants had an imminent "deal" with Home Depot to sell 1.2 million insect repellent patches;

c. The Corporate Defendants had a CFO;

d. The Corporate Defendants have three "DBA" business units; and

e. The DBAs have a "current customer base."

116. For the reasons set forth herein, these statements were false when made.

117. Moreover, Kalmar omitted to disclose to Nutriband his criminal history of dishonest, fraudulent acts, which omission made Kalmar's statements about his professional industry experience and thus his qualifications to sit on Nutriband's board of directors fraudulently incomplete and misleading.

118. Because Kalmar is the CEO of the Corporate Defendants, his misstatements and omissions of material fact are imputed to the Corporate Defendants.

119. Defendants' misstatements and omissions of fact were material in that they were important to Nutriband's decision to enter into the Agreement and issue the 5 million shares of Company stock to the Individual Defendants and Person No. 1 and Person No. 2, at Kalmar's direction. Indeed, these misstatements and omissions of fact would have been important to any reasonable investor's decision-making as they suggested (falsely) that the Corporate Defendants had, among other things, sound management, including a CFO, projected sales revenues and growth, and real business opportunities—when none of these were true.

120. Defendants acted with scienter in that they knew, or were reckless in not knowing, that these misstatements and omissions were untrue or misleading at the time they were made.

121. Because Kalmar is the CEO of the Corporate Defendants, his scienter is imputed to the Corporate Defendants.

122. Nutriband reasonably relied on Defendants' false and misleading statements, omissions, and conduct in deciding to enter into the Agreement in May 2017, to issue the 5 million shares of stock to the Individual Defendants and to Person No. 1 and Person No. 2 at Kalmar's direction, and to appoint Kalmar and Murphy to the board of directors. Had Nutriband known that Defendants' statements about the business of the Corporate Defendants as set forth herein were false and incomplete, Nutriband would not have entered into the Agreement, would not have issued the 5 million shares of Company stock to the Individual Defendants and to Person No. 1 and Person No. 2, and would not have appointed Kalmar and Murphy to its board of directors.

123. The untrue statements and omissions of material fact made by Kalmar, Advance Health, and TD Therapeutic caused Plaintiff to incur losses and damages in the amount of 5 million shares of Plaintiff's stock, with a current market value of $47 million, and the loss of 24% ownership interest in Nutriband.

124. The Corporate Defendants' stock, on the other hand, is essentially worthless because the Defendants disguised the very risks plaguing the Corporate Defendants, including, but not limited to, the Corporate Defendants' lack of a "team" of independent sales reps, the Corporate Defendants' lack of an imminent "deal" with Home Depot, the Corporate Defendants' lack of a CFO, and the Corporate Defendants' lack of operating business units and an existing customer base. The materialization of these misrepresentations and omissions is what has rendered the Corporate Defendants' stock worthless and cost Nutriband substantial damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Nutriband respectfully demands that the Court enter judgment in its favor and against Defendants on all causes of action, and award Plaintiff:

A. An order rescinding the May 22, 2017 Share Exchange Agreement and ordering the return of the 4.8 million shares of Nutriband stock now held by the Individual Defendants and Person No. 2;

B. In the alternative, a judgment for monetary damages against Defendants, jointly and severally, in the amount of $45,264,000, representing the current market value of the 4.8 million shares of Nutriband stock now held by the Individual Defendants and Person No. 2;

C. Punitive damages;

D. Attorneys' fees and costs; and

E. Such other relief as the Court deems just and proper.

**DEMAND FOR A TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury.

Dated: April 29, 2019
New York, New York

**COZEN O'CONNOR**

By: */s/ Joseph Dever*
Joseph Dever (JD-9589)
Tamar Wise (TW-0566)
45 Broadway, 16th Floor
New York, New York 10006
(212) 509-94000
jdever@cozen.com
twise@cozen.com
*Attorneys for Plaintiff Nutriband, Inc.*