UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____
NUTRIBAND, INC.,

                Plaintiff,

      -against-

RAYMOND KALMAR, PAUL MURPHY,
MICHELLE POLLY-MURPHY, ADVANCED
HEALTH BRANDS, INC., and TD
THERAPEUTIC, INC.,

                Defendants.
_____

**MEMORANDUM & ORDER**
**19-CV-2511 (NGG) (SJB)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Nutriband, Inc. ("Nutriband") brings this action against Raymond Kalmar, Paul Murphy, Michelle Polly-Murphy (the "Individual Defendants"), Advanced Health Brands, Inc., and TD Therapeutic, Inc. (the "Corporate Defendants") (collectively "Defendants") alleging violations of Section 10(b), Rule 10b-5, and Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and common law fraud. (*See* Compl. (Dkt. 1).) Before the court is the Individual Defendants' motion to dismiss Nutriband's claims pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). (*See* Mot. to Dismiss ("Mot.") (Dkt. 28).) For the reasons stated below, the Individual Defendants' motion is DENIED.

## I.  BACKGROUND

Nutriband is a company principally engaged in the development of a portfolio of transdermal pharmaceutical products. (Compl. ¶ 15.) These products are patches that adhere to the skin and through which various ingredients (such as health supplements or other pharmaceuticals) pass over time, providing an alternative delivery mechanism to traditional oral tablets. (*Id.* ¶ 22.) As of 2016, Nutriband's transdermal patch line solely consisted of

over-the-counter nutritional health supplements and did not include patches containing pharmaceutical ingredients. (*Id.* ¶ 24.) However, Nutriband was interested in expanding its business and product lines to include pharmaceutical patches. (*Id.*)

In December 2016, Defendant Kalmar sent an unsolicited email to Nutriband inquiring whether Nutriband was interested in entering into a partnership with the Corporate Defendants. (*Id.* ¶ 25.) Kalmar, who held himself out as the CEO of the Corporate Defendants, explained in his email that the Corporate Defendants were sister-healthcare companies with a focus on developing transdermal patch delivery technology for drugs, vitamins, and minerals. (*Id.* ¶ 26.) Kalmar further wrote that the Corporate Defendants had a network of independent sales representatives with connections at health food stores and independent pharmacies. (*Id.* ¶ 27.)

Given Kalmar's representations and Nutriband's interest in expanding into pharmaceutical patches, Nutriband entered into partnership discussions with the Corporate Defendants. (*Id.* ¶ 30.) Nutriband alleges that throughout these discussions, Kalmar made false and misleading statements about, *inter alia*, the existence of a team of sales representative with contacts across the United States; an imminent deal with Home Depot in which Home Depot would purchase 1.2 million insect repellant patches from the Corporate Defendants; the scope of the Corporate Defendants' leadership team, including representing that the Corporate Defendants had a CFO; the existence of "doing-business-as" ("DBA") business units within the companies; an existing customer base; and significant projected sales revenue. (*See Id.* ¶¶ 31-59.) Nutriband also alleges that, throughout the partnership negotiations, Kalmar failed to disclose his criminal history when describing his qualifications and experience in the industry. (*Id.* ¶¶ 60-63.)

The parties entered into a share exchange agreement (the "Agreement") on May 22, 2017. (*Id.* ¶ 66.) Pursuant to the Agreement, Nutriband issued 5 million shares of company stock to the Individual Defendants and two unidentified people: Person 1, whom Kalmar had represented was the CFO of the Corporate Defendants, and Person 2. (*Id.*) Kalmar claimed both Person 1 and Person 2 were early investors in the Corporate Defendants. (*Id.*) Nutriband also appointed Kalmar and Defendant Murphy to seats on Nutriband's board of directors. (*Id.*) In exchange, the Individual Defendants agreed to transfer and assign to Nutriband all of their shares of the Corporate Defendants' common stock and the portfolio of pharmaceutical transdermal patches (the "IP"). (*Id.*) In or around late July or early August 2017, Nutriband, through its stock transfer agent, prepared stock certificates for a total of 5 million shares of Nutriband stock and issued 2.1 million shares to Kalmar; 2.1 million shares to Murphy; 500,000 shares to Polly-Murphy; 200,000 shares to Person No. 1; and 100,000 shares to Person No. 2. (*Id.* ¶ 67.)

However, Nutriband learned in June 2018 that the Individual Defendants neither executed necessary corporate documents to effectuate the Agreement nor undertook any measures to transfer and assign to Nutriband either their stock ownership in the Corporate Defendants or the IP. (*Id.* ¶ 68.) Nutriband discovered that it never became the legal owner of the Corporate Defendants and that the Individual Defendants had maintained their ownership of the two companies. (*Id.* ¶ 71.) Nutriband also learned that, instead of assigning the IP to Nutriband per the terms of the Agreement, Kalmar kept the IP in Advanced Health's name, allowed it to expire, and then refiled the IP in his own name (for him personally and individually to own and control). (*Id.* ¶ 73.) In addition, Kalmar dissolved Advanced Health with the Michigan Secretary of State. (*Id.*)

On July 26, 2018, Nutriband filed a complaint against Advanced Health, the Individual Defendants, and two other individuals in Florida state court, seeking replevin, rescission, and compensation under a theory of unjust enrichment. (*See* Nutriband Florida Compl. (Dkt. 28-7).) The trial court dismissed Nutriband's complaint with prejudice; however, the Florida Circuit Court held that the trial court "erred in several respects," including in dismissing Nutriband's complaint with prejudice, and granted Nutriband an opportunity to amend its complaint. *See Nutriband, Inc. v. Advanced Health Brands, Inc.*, 291 So.3d 1276 (Fla. Cir. Ct. 2020). According to the parties, Nutriband filed an amended complaint in Florida state court on June 12, 2020. (*See* Dkt. 29.)

Nutriband commenced this securities fraud action in this court on April 29, 2019. (Compl.) On September 25, 2019, the Individual Defendants filed a fully briefed motion to dismiss. (*See* Mot; Mem. in Supp. of Mot. to Dismiss ("Mem.") (Dkt. 28-1); Pl. Opp. to Mot. to Dismiss ("Opp.") (Dkt. 28-15); Reply (Dkt. 28-16).)

## II. PERSONAL JURISDICTION

### A. Standard of Review for Personal Jurisdiction

"When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).[1] "[T]he plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant." *Id.* The pleadings are construed in the light most favorable to the plaintiff, and all doubts are resolved in its favor. *Id.*

---

[1] When quoting cases, unless otherwise noted, citations and quotation marks are omitted and all alterations are adopted.

Nutriband's claims are based on the Securities and Exchange Act of 1934 ("Exchange Act"). Section 27(a) of the Exchange Act provides for worldwide service of process and permits the exercise of personal jurisdiction to the limit of the Fifth Amendment's Due Process Clause. *See* 15 U.S.C. § 78aa; *see also SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990).The Individual Defendants do not argue that they were improperly served. Accordingly, they are subject to this court's jurisdiction unless its exercise would violate their Fifth Amendment due process rights.

"The due process test for personal jurisdiction has two related components: (1) a 'minimum contacts' inquiry, and (2) a 'reasonableness' inquiry." *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). "The court must first determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." *Id.* If such contacts exist, the court may assert personal jurisdiction so long as "it is reasonable under the circumstances of the particular case." *Id.* at 568.

### B. Minimum Contacts

In federal question cases brought under a statute where Congress has provided for worldwide service of process, a defendant's aggregate contacts with the United States govern the minimum contacts inquiry. *See Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998) ("The due process analysis is basically the same under both the Fifth and Fourteenth Amendments. The principal difference is that under the Fifth Amendment the court can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered."); *see also S.E.C. v. Softpoint, Inc.*, No. 95-cv-2951 (GEL), 2001 WL 43611, at *5 (S.D.N.Y. Jan. 18, 2001) ("Second Circuit authority clearly establishes that the constitutionality of *in personam* jurisdiction in federal question cases

where Congress has provided for worldwide service is to be determined by national, rather than local, contacts.").

The minimum contacts requirement is satisfied where a defendant's conduct and connection with the United States are such that "he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Here, the complaint alleges sufficient contacts by the Individual Defendants. All are citizens and residents of the United States and all of their alleged unlawful conduct took place in the United States. The Individual Defendants concede as much (*see* Mem. at 11), arguing instead that it would not be reasonable for this court to exercise jurisdiction because of their limited connections to New York.

### C.  Reasonableness

The reasonableness inquiry asks whether the assertion of personal jurisdiction in a particular case comports with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945). The following factors govern reasonableness: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *See Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113 (1987).

Where a plaintiff demonstrates sufficient minimum contacts, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985); *Asahi*, 480 U.S. at 116 (Brennan, J., concurring) (finding that only in "rare cases" will inconvenience defeat the reasonableness of jurisdiction). The reasonableness inquiry is "largely academic

in non-diversity cases brought under a federal law which pro-
vides for nationwide service of process" because of the strong
federal interests involved. *S.E.C. v. Syndicated Food Servs. Intern.,
Inc.*, No. 04-cv-1303 (NGG), 2010 WL 3528406, at *3 (E.D.N.Y.
Sept. 3, 2013); *accord Softpoint*, 2001 WL 43611, at *5. "To date,
while most courts continue to apply the test as a constitutional
floor to protect litigants from truly undue burdens, few (and
none in this circuit) have ever declined jurisdiction, on fairness
grounds, in such cases." *Syndicated Food Servs.*, 2010 WL
3528406, at *3.

Here, the Individual Defendants have failed to show that the
court's exercise of jurisdiction in this matter will "make litigation
so gravely difficult and inconvenient that [they] unfairly [are] at
a severe disadvantage in comparison to their opponent." *Burger
King*, 471 U.S. at 478. The Individual Defendants' argument that
their residence in Ohio and Michigan "imposes some burden on
them" and "militates against this court exercising personal juris-
diction" fails to meet the required showing of "severe
disadvantage," especially in light of the "realities of modern
transportation and communication, as well as the nature of civil
litigation." *Syndicated Food Servs.*, 2010 WL 3528406, at *3; *see
also S.E.C. v. Straub*, 921 F. Supp. 2d 244, 259 (S.D.N.Y. 2013).
The Individual Defendants' arguments with respect to the other
reasonableness factors likewise fail to demonstrate that litigating
this case would place a "severe" or "gravely difficult" burden on
them, or otherwise provide a "compelling" reason as to why the
court's exercise of jurisdiction over this case would offend "tradi-
tional notions of fair play and substantial justice." *See Burger
King*, 471 U.S. at 478. Therefore, the court finds that exercise of
personal jurisdiction over the Individual Defendants is not unrea-
sonable. *See Straub*, 921 F. Supp. 2d at 259 ("Like each and every
court in this Circuit to have applied the reasonableness standard
after determining that a given defendant has the requisite mini-
mum contacts, this [c]ourt finds that this is not the rare case

where the reasonableness analysis defeats the exercise of personal jurisdiction.").

Accordingly, because Nutriband has established that the Individual Defendants have minimum contacts with the United States and that the exercise of personal jurisdiction over the Individual Defendants would not be unreasonable, the court finds that Nutriband has met its burden at this stage of the case to establish a prima facie case of personal jurisdiction over the Individual Defendants.

## III.  RULE 12(B)(6) MOTION TO DISMISS

### A.  Allegations in the Complaint

Nutriband alleges that the Individual Defendants violated the Exchange Act by making numerous false and misleading statements upon which Nutriband relied when deciding to enter into the Agreement. Specifically, Nutriband alleges that over the course of a five-month period between December 2016 and May 2017, the Individual Defendants made material misstatements and omissions in five separate categories, all in an effort to induce Nutriband to enter into the Agreement with the Corporate Defendants.

#### 1.  Presence of Independent Sales Representatives

Nutriband alleges that in an email from Kalmar to Nutriband's CEO dated December 4, 2016, Kalmar stated that the Corporate Defendants "have a team of independent sales reps that promote into thousands of natural and health food stores as well as independent pharmacies across the United States waiting for our first consumer product." (Compl. ¶ 27.) Nutriband alleges that, in fact, neither of the Corporate Defendants had any independent sales representatives and, after closing the Agreement, the Individual Defendants were unable to identify or introduce Nutriband to any independent sales representatives working for either of the Corporate Defendants. (*Id.* ¶ 28.)

### 2. Home Depot Deal Negotiations

Nutriband alleges that Kalmar falsely represented that the Corporate Defendants were on the "brink" of closing a "deal" with Home Depot. (*Id.* ¶ 31). In an email from Nutriband's CEO to Kalmar dated December 16, 2016, Nutriband's CEO wrote "I was under the impression they [Home Depot] were ready to order and launch immediately and the only thing holding things up was because you were trying to find a suitable manufacturer." (*Id.* ¶ 32.) In an email response that same day, Kalmar stated "[y]our impression [of the Home Depot deal] was correct, we were nearly ready to close the deal with Home Depot and due to manufacturing issues and timeliness running into late fall, early winter they decided to hold off until early 2017;" and "while discussing the potential deal with Home Depot for insect repellant patches their initial order would have required a 1.2 million patch run to put together all the POS [purchase orders] boxes they wanted. We need the ability to run a minimum of a million patches in a week if needed." (*Id.*) Nutriband alleges that the Corporate Defendants were not, in fact, "ready to close" a deal with Home Depot and that after closing the Agreement, the Individual Defendants were not able to identify or introduce to Nutriband anyone from Home Depot and never obtained any purchase orders for any patch products from Home Depot. (*Id.* ¶ 33.)

### 3. Leadership Team Includes a CFO

Nutriband alleges that in an email from Kalmar to Nutriband's CEO dated December 28, 2016, Kalmar stated that the Corporate Defendants' management "team" included a "Chief Financial Officer;" in an email from Kalmar to Nutriband's CEO dated January 20, 2017, Kalmar stated that Person No. 1 is "our CFO;" and in an email, dated January 20, 2017, from Kalmar to Nutriband's CEO, Kalmar sent a TD Therapeutic business plan stating that Person No. 1 was the Corporate Defendants' CFO. (*Id.* ¶¶ 35-

36.) Nutriband alleges that, in fact, Person No. 1 has never been employed or otherwise worked for either of the Corporate Defendants in any capacity. (*Id.* ¶ 37.) Nutriband further alleges that Person No. 1, who at all relevant times was employed full-time at a consulting and management firm, told Nutriband's CEO that although she knew Kalmar and had on occasion discussed the possibility of assisting him, she never agreed to act as the CFO for either of the Corporate Defendants and was unaware that Kalmar had listed her as the CFO of TD Therapeutic. (*Id.* ¶¶ 38-39.)

### 4.   Statements Regarding DBA Units

Nutriband alleges that the Individual Defendants made various misstatements and omissions concerning three DBA business units within Corporate Defendants' corporate structure. According to an email from Kalmar to Nutriband's CEO dated January 10, 2017, Kalmar stated there were three such DBA units: "US Chem Labs," "U[S] BioLabs," and "US Cleanroom Concepts." (*Id.* ¶ 41.) Nutriband alleges that, in fact, the Corporate Defendants did not have any DBA business units. (*Id.* ¶ 42.)

#### a.   *False statements with respect to US ChemLabs*

Nutriband alleges that in an email from Kalmar to Nutriband's CEO dated January 10, 2017, Kalmar provided a written description of US ChemLabs that stated it was a "[w]holesale bulk chemical business [that] can work directly with larger compounders to bring in exactly what customers need and plan quarterly to inventory needed bulk material to keep inventory turning." (*Id.* ¶ 44.) The same written description stated that "[w]ith our established contacts in this industry we anticipate taking a minimum of 15% of the market [wholesale bulk chemical market] which is about $62m annually." (*Id.*) Nutriband further alleges that Kalmar also attached a list to the written description of 2,659 companies throughout the United States with which he and Defendant Murphy had contacts that would send them business. (*Id.*) Nutriband alleges that, in fact, the Corporate

10

Defendants were never engaged in the business of wholesaling bulk chemicals to customers, that Kalmar made the $62 million sales projection without any reasonable basis in fact or investigation, and that after the closing of the Agreement, Defendants were unable to identify or introduce Nutriband to any customers for the US ChemLabs business. (*Id.* ¶¶ 46-47.) Nutriband alleges that the business line was not operational, did not generate any revenue, and that US ChemLabs did not have contacts at the 2,659 companies listed in Defendant Murphy's email. (*Id.*)

> b.   *False statements with respect to US Cleanroom*

Nutriband alleges that in an email from Kalmar to Nutriband's CEO dated January 10, 2017, Kalmar provided a written description of US Cleanroom which stated that it was in the business of constructing "[c]ontrolled environments for compounding, manufacturing, packaging & more." (*Id.* ¶ 49.) In the same written description, Kalmar stated that the US Cleanroom business line constructed FDA compliant classrooms and that US Cleanroom's "[s]ales potential is $200,000 for the first year with a 50% profit margin." (*Id.*) Nutriband alleges that, in fact, neither of the Corporate Defendants were engaged in the business of constructing either controlled environments or FDA compliant cleanrooms, and that Kalmar made the "$200,000 for first year" sales projection without any reasonable basis in fact or investigation. (*Id.* ¶ 50.) Nutriband further alleges that, after the closing of the Agreement, Defendants were unable to identify or introduce Nutriband to any customers of the US Cleanroom business and that this business line was not operational and did not generate any revenues. (*Id.* ¶ 51.)

> c.   *False statements with respect to US BioLabs*

Nutriband alleges that in an email from Kalmar to Nutriband's CEO dated January 10, 2017, Kalmar provided a written description of US BioLabs as a "chemistry department [that] provides quality compendial and non-compendial chemical analysis of

raw materials and final product." (*Id.* ¶ 53.) In the same email, Kalmar included a spreadsheet projecting that US BioLabs sales revenue from August 2017 through July 2018 would total $1,793,000. (*Id.*) In an email dated March 5, 2017 from Murphy to Nutriband's CEO, Defendant Murphy provided a written description of US BioLabs that stated that it "[u]tiliz[es] our current customer base for chemicals [US ChemLabs] and cleanrooms [US Cleanrooms], same customer base." (*Id.* ¶ 57.) Nutriband alleges that, in fact, neither of the Corporate Defendants had a "chemistry lab" or was otherwise engaged in the business of conducting chemical testing or analysis of any materials and that, after closing the Agreement, Defendants were unable to identify or introduce Nutriband to any US BioLabs customers and the US BioLabs business line was not operational and did not generate any revenues. (*Id.* ¶ 54.) Nutriband also alleges that Kalmar made the US BioLabs sales projection of $1,793,000 without any reasonable basis in fact or investigation, and that US BioLabs did not have a customer base, contrary to Murphy's assertions. (*Id.* ¶¶ 55-59.)

### 5.   Kalmar's Criminal History

Nutriband alleges that in various emails from Kalmar to Nutriband's CEO between December 2016 and January 2017, Kalmar falsely and misleadingly described his professional experience in the pharmaceutical industry and his qualifications to be a member of Nutriband's board of directors because he omitted from these statements that he has numerous criminal convictions for passing fraudulent checks in several states, including North Carolina, South Carolina, and Florida. (*Id.* ¶¶ 60-63.)

### B.   Legal Standard

#### 1.   Rule 12(b)(6) Motion to Dismiss

Rule 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P.

12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint should be dismissed if the plaintiff has not offered factual allegations sufficient to render the claims facially plausible. *See id.* However, a court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In resolving a Rule 12(b)(6) motion, the court's task is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *In re Initial Pub. Offering Sec. Litig.*, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) *aff'd sub nom. Tenney v. Credit Suisse First Boston Corp.*, No. 05-cv-3430, 2006 WL 1423785 (2d Cir. May 19, 2006). In this context, the court must draw reasonable inferences in favor of the non-moving party. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, the requirement that a court accept the factual allegations in the claim as true does not extend to legal conclusions. *See Iqbal*, 556 U.S. at 678.

Plaintiffs claiming fraud—including securities fraud concerning material misstatements and omissions—must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) by "stat[ing] with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). The Private Securities Litigation Reform Act of 1995 (the

"PSLRA"), 15 U.S.C. § 78u-4(b), also imposes heightened pleading standards for plaintiffs alleging securities fraud. When a plaintiff alleges that defendants made misleading statements or omissions, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). To adequately plead scienter, "the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

### 2.   Section 10(b) and Rule 10b-5 of the Exchange Act

To state a claim for misrepresentation or omission under Section 10(b) and Rule 10b-5, "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relief, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI*, 493 F.3d at 105; *see also In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 465 (E.D.N.Y. 2020). Here, the Individual Defendants argue that Nutriband has failed to allege any false or misleading statements or omissions of material fact on the part of the Individual Defendants and has also failed to allege that the Individual Defendants acted with scienter.

### a.   Misstatements or Omissions of Material Fact

A statement is actionable under Section 10(b) only if it is, directly or by omission, "misleading as to a material fact." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011). Therefore, for a statement to be actionable under Section 10(b), "the statement

must be false, and the statement must be material. Neither immaterial false statements nor material true statements are actionable." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). For a statement to be false for the purposes of a Section 10(b) claim, it must be "false at the time it was made." *Id.*; *see also id.* ("A statement believed to be true when made, but later shown to be false, is insufficient."). Plaintiffs must do more than assert that a statement is false; "they must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174.

A statement of fact is material if it is likely to be "viewed by the reasonable investor as . . . significantly altering the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *see also United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) ("A misstatement in a securities transaction is material so long as there is a substantial likelihood that a reasonable investor would find the misrepresentation important in making an investment decision"); *Meyer v. Jinkosolar Holdings Co. Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context"); *Rombach*, 355 F.3d at 172 n.7 (whether a statement is materially misleading under Section 10(b) turns on "whether the defendants' representations, taken together and in context, would have misled a reasonable investor").

Whether an alleged misstatement meets this materiality requirement is a fact-specific inquiry that "necessary depends on all relevant circumstances" of that specific case and is a "fact-intensive inquiry more appropriate for summary judgment or trial." *Oklahoma Firefighters Pension and Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 30-31 (S.D.N.Y. 2019). As such, at the 12(b)(6) stage, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not

material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

  *b.*  Scienter

To plead a "strong inference" of scienter as required for claims under Section 10(b), a plaintiff must allege "facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Recklessness may be shown by allegations that defendants "knew facts or had access to information suggesting that their public statements were not accurate or failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). For a complaint to survive a motion to dismiss, it must allege facts from which "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Crucially, the inference need not be "irrefutable" or of the "smoking-gun genre," or even the "most plausible of competing inferences.' *Id.* "The court's job is not to scrutinize each allegation in isolation," but to consider whether the allegations holistically raise a strong inference of scienter. *Id.* at 326.

  **C.**  **Discussion**

   1.  Falsity of Alleged Misstatements and Omissions

Nutriband has adequately alleged numerous misleading statements and omissions on the part of the Individual Defendants.

First, Nutriband has adequately alleged that Kalmar's statement regarding the Corporate Defendants' "team" of sales representatives was misleading. Nutriband alleges that the Corporate Defendants had no such "team" in place, and has pled additional

16

facts to demonstrate "how and why" that is the case—by, for instance, alleging that after the Agreement was signed the Corporate Defendants were unable to introduce to Nutriband any of the supposed "team" members. *See Rombach*, 355 F.3d at 174. The Individual Defendants argue that Kalmar's statement regarding the Corporate Defendants' "team" of sales representatives could not have been false or misleading (*see* Mem. at 14-15; Reply at 5-6), because the Agreement itself disclaimed both that the Corporate Defendants had any employees or had ever conducted operations. (*See* Share Exchange Agreement (Dkt. 28-4) at ECF 13).[2] The court disagrees. The fact that, at the time the Agreement was signed, Corporate Defendants disclaimed having conducted any operations does not necessarily mean that Kalmar's earlier statement about the Corporate Defendants' capabilities to conduct operations in the future was not misleading in the context of Nutriband's expressed interest in expanding the scope of its business through a partnership with the Corporate Defendants.

Second, Nutriband has adequately alleged that Kalmar's representations about an "imminent" deal with Home Depot was misleading. Nutriband has alleged that, despite Kalmar's representations, the Corporate Defendants had never entered into negotiations with Home Depot and, therefore, could not have been "ready to close" a deal with them. Nutriband alleges that, in fact, Defendants were unable to introduce to Nutriband to any contacts at Home Depot whatsoever. These allegations are sufficient to allege falsity at this stage.

---

[2] Section 3.1(f) of the Agreement reads: "(f) No Operations. Advanced was organized on April 8, 2016 and has never conducted operations or incurred any liability" and Section 3.1(h) reads: "Employees. Advanced does not now have, or has never had employees." The court can consider the contents of the Agreement in deciding the instant motion because it is integral to the complaint. *See Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005).

The Individual Defendants argue that Kalmar's statements regarding the "imminent" Home Depot deal were not misleading because: (1) they were contradicted by the Agreement itself; (2) Kalmar clarified to Nutriband's CEO that Home Depot "decided to hold off [on the deal] until early 2017"; and (3) they were "sincere statements of pure opinion" and therefore not "untrue statement[s] of material fact." (*See* Mem. at 15.) With respect to the first argument, the court disagrees with the Individual Defendants for substantially the same reasons as discussed above with respect to Kalmar's representation about the Corporate Defendants' sales representatives: the fact that the Agreement disclaims that the Corporate Defendants had ever conducted operations does not mean that they had not established contacts with Home Depot and were not "ready to close" a deal with them. Second, the fact that Kalmar noted that Home Depot "decided to hold off [on the deal] until early 2017" does not, on its own, make Kalmar's statement that the Corporate Defendants were "ready to close" a deal with Home Depot that would include "orders for over 1.2 million insect repellant patches" from the Corporate Defendants not misleading. (*See* Compl. ¶¶ 31-34.) To the contrary, that Home Depot decided to not go forward with the deal for a few months does not change the falsity, based on Nutriband's allegations, of Kalmar's statements about Corporate Defendants' negotiations with and contacts at Home Depot, as well the scope of the proposed deal with Home Depot. Finally, the alleged misstatements at issue—"we were nearly ready to close the deal with Home Depot and due to manufacturing issues and timeliness running into late fall, early winter they decided to hold off until early 2017" and "while discussing the potential deal with home Depot for insect repellant patches their initial order would have required a 1.2 million patch run to put together all the [purchase orders] they wanted" (*id.*)—are factual statements, not "vague and optimistic statements that are too general

to cause a reasonable investor to rely upon." *See Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 497 (2d Cir. 2019) (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chi. V. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)). The Individual Defendants' argument that Kalmar was being "truthful and candid" is belied by Nutriband's allegations, which the court must accept as true, that the Corporate Defendants never entered into negotiations with Home Depot, were not "ready to close a deal" with Home Depot, and could not, after the Agreement was signed, put Nutriband in touch with any contacts from Home Depot.

Furthermore, to the extent Kalmar's statements regarding the Home Depot deal were statements of opinion, they would still be actionable. Under the securities laws, "a sincere statement of pure opinion is not an untrue statement of material fact, regardless of whether an investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund.*, 575 U.S. 175, 186 (2015). As such, it is "not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, or not borne out by subsequent events." *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 24 (S.D.N.Y 2016). However, "liability for making a false statement of opinion may lie if either the speaker did not hold the belief she professed or the supporting facts she supplied were untrue." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016). Based on Nutriband's allegations, Kalmar's statement was not merely an "excessively optimistic" prediction based on truthful underlying facts; rather, the statement that the Corporate Defendants were "ready to close" a deal with Home Depot was accompanied by untrue supporting facts, *i.e.* that the Corporate Defendants were ever in negotiations with Home Depot in the first place.

19

Third, Nutriband has adequately alleged that Kalmar's various representations about the Corporate Defendants' DBA business units were misleading.

To begin with, the court agrees with the Individual Defendants that Kalmar's representations about the DBA business unit's potential revenue, are, on their own, "inactionable puffery." (Reply at 7.) "Puffery is an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law." *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 384 (S.D.N.Y. 2012). The puffery rules allow companies "to operate with a hopeful outlook," because corporate officers "are not required to take a gloomy, fearful or defeatist view of the future." *Rombach*, 355 F.3d at 174. Statements are not considered puffery, however, when they constitute "misrepresentations of existing facts" that were made even though the speaker "knew that the contrary was true." *Novak*, 216 F.3d at 315; *see also In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010) ("[T]here is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in misrepresentation of existing facts."). This includes statements regarding projections of future performance, which may be actionable "if they are worded as guarantees or are supported by specific statements of fact, . . . or if the speaker does not genuinely or reasonably believe them." *In re Int'l Bus. Mach. Corp. Sec. Litig*, 163 F.3d 102, 107 (2d Cir. 1998).

Here, Kalmar's representations regarding the specific expected revenue of each of the DBA business units, on their own, are too general for a reasonable investor to have relied on them. This is because the statements contain sufficient qualifying language— *e.g.*, "we anticipate" and "sales potential" and "expected monthly sales revenue"—such that they constitute general statements of corporate optimism that are not actionable under the securities

laws because they are not "sufficiently specific that a reasonable investor could rely on them as a guarantee of some concrete fact or outcome." *Lopez*, 173 F. Supp. 3d at 29.

However, Nutriband also alleges that these predictions were accompanied by other statements, including that: (1) the various DBA business units were involved in the "wholesale bulk chemical business," and the "controlled environments for compounding, manufacturing, packaging" business, and that the US BioLabs DBA had a "chemistry lab", and (2) the three DBA business units shared the same customer base and contacts, which numbered over 2,600. (*See* Compl. ¶¶ 41-59.) Nutriband further alleges that all of these statements were false—that the Corporate Defendants had no DBA business units, customer bases, or relevant contacts. (*See, e.g.* ¶ 42.) Taking these allegations as true, Kalmar's predictions about future revenue for the DBA business units are actionable misstatements because they "contradict[ed] facts that [were] known" to him—*e.g.* that the DBA business units neither existed nor had contacts or customer bases—and therefore amounted to "misrepresentations of existing facts that were made even though [he] knew that the contrary was true." *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 2d 282, 298 (S.D.N.Y. 2018) (quoting *Novak*, 216 F.3d at 315).

Fourth, Nutriband has adequately alleged that Kalmar's representations regarding the presence of a CFO on the Corporate Defendants' leadership team were misleading. Nutriband alleges that Kalmar's repeated references to Person No. 1 as the Corporate Defendants' CFO (*see, e.g.* Compl. ¶¶ 36-37) were misleading because, *inter alia*, Person No. 1 had never been employed or even worked with the Corporate Defendants and Person No. 1 even stated that "she was unaware that Kalmar had listed her as the CFO . . . and that he did so without her permission and consent." (*Id.* ¶ 38.) These allegations are sufficient at this juncture to support the falsity of Kalmar's representations.

Finally, Nutriband has adequately alleged that Kalmar's omission of his criminal history—specifically, his "past criminal convictions for passing bad checks in several states" (*Id.* ¶ 63)—was misleading under an omissions theory. A "pure omission" is only "actionable under the securities laws [ ] when the corporation is subject to a duty to disclose the omitted facts." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). However, so-called "half truths," which are "literally true statements that create a materially misleading impression" can support a claim for securities fraud. *See S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, *Gabelli v. S.E.C.* 568 U.S. 442 (2013); *see also Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2000 (2016) ("[H]alf-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations."). Here, Nutriband has alleged that while Kalmar provided information on his and Murphy's background in the industry, that information was "the truth only so far as it goes" because it failed to disclose Kalmar's criminal history. (*See* Compl. ¶¶ 61-63.) Nutriband further alleges that Kalmar's omission was particularly misleading because, *inter alia*, Kalmar's alleged criminal history involved acts of dishonesty. (*Id.* ¶ 63.) That is sufficient to establish an actionable omission at this juncture.

### 2.    Materiality of Misstatements and Omissions

The Individual Defendants argue that, even if the alleged misstatements are misleading, they are still not actionable because they are not material. As explained above, materiality is a "fact-intensive inquiry" that "necessarily depends on all relevant circumstances." *Lexmark*, 367 F. Supp. 3d at 30; *see also Halperin v. eBanker USA.com Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("The touchstone of the [materiality] inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in

context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.").

Here, the court cannot say at this stage of the case that, as a matter of law, Kalmar's various misrepresentations were not material to Nutriband's decision to seek a partnership with the Corporate Defendants and ultimately sign the Agreement. Taken together, the alleged misstatements by the Individual Defendants—*e.g.*, that the Corporate Defendants had numerous sales representatives with connections in relevant pharmacies for patch-related business; that the Corporate Defendants had been in negotiations with and had numerous contacts at Home Depot, a potential large-scale client; that Corporate Defendants had a leadership team that included a CFO; that Corporate Defendants had numerous DBA business units with sales projections in the millions of dollars and numerous relevant business connections; and that, as far as Nutriband knew, Kalmar had years of experience in the industry and no history of fraud—altered the "total mix" of information available to Nutriband about the desirability of entering into an agreement with the Corporate Defendants to pursue its goal of expanding its transdermal patch business. *See Basic*, 485 U.S. at 231-32. At this stage, that is sufficient to establish materiality. *See Ganino*, 228 F.3d at 162.

The Individual Defendants argue that none of the alleged misrepresentations are material because "the [Agreement] was executed to allow Nutriband to enter the transdermal pharmaceutical patch market by acquiring [Corporate Defendants'] IP," and, as such, the various misrepresentations were "secondary to the acquisition of the IP." (Mem. at 17.) However, contrary to the Individual Defendants' assertion, the complaint alleges that these misrepresentations were "important to Nutriband's decision to enter into the Agreement," at least in part because they suggested

23

to Nutriband that the Corporate Defendants had "sound management, including a CFO[3], projected sales revenues and growth, and real business opportunities." (*See* Compl. ¶¶ 85, 105, 119.) Whether Nutriband was only interested in entering into the Agreement because of the IP (which it alleges it never became the owner of) or was interested in entering the Agreement because of the combination of the IP and their expectations about the capabilities of Corporate Defendants and the potential of a business partnership with them is a paradigmatic factual dispute that is "more appropriate for summary judgment or trial." *Lexmark*, 367 F. Supp. 3d at 31.[4]

Accordingly, the court finds that Nutriband has adequately alleged misleading statements and omissions of material fact that are actionable under Section 10(b) and Rule 10b-5.

### 3. Scienter

Finally, Nutriband has adequately plead scienter under a "motive and opportunity" theory. In this case, the Individual Defendants are corporate insiders at the highest level, which gives rise to the

---

[3] The court notes that the materiality of Kalmar's representation that Person 1 was the Corporate Defendants' CFO is a closer call given that Nutriband disclosed in its SEC filings that Person 1 served as its Vice President of Finance before the transaction. (Mem. at 18-19.) However, Person 1's role at both Nutriband and the Corporate Defendants, and the relative materiality of Person 1's role to Nutriband's decision to enter the Agreement, are clearly factual disputes that must be resolved in discovery, especially in light of both the numerous misrepresentations that have been alleged and the limited review the court may undertake of the appended SEC filings at the motion to dismiss stage. *See Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (court may take judicial notice of SEC filings at motion to dismiss stage, but only for non-hearsay purposes).

[4] The same logic applies to the Individual Defendants' argument that "to the extent each of the statements were material, Nutriband could have conducted due diligence and verified each of the alleged misrepresentations made during the initial month of negotiations. Nutriband cannot use a securities fraud claim to second-guess the transaction." (Reply at 8.)

presumption of an opportunity to commit fraud. *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 493 (S.D.N.Y. 2018) ("[T]his [c]ourt presumes that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired. Thus the only question is whether the [c]omplaint adequately pleads motive."). To demonstrate motive, a plaintiff "must allege that the corporate defendant or its officers benefited in some concrete and personal way from the purported fraud," typically by alleging corporate insiders "made a misrepresentation in order to sell their own shares at a profit." *ECA*, 553 F.3d at 198. Here, Nutriband has adequately plead that the Individual Defendants made numerous misrepresentations[5] to make the Corporate Defendants seem more desirable to Nutriband that, ultimately, allowed the Individual Defendants to sell their stock in the Corporate Defendants (which Nutriband alleges is "essentially worthless") for 5 million shares of Nutriband's stock, currently valued at $47 million. (*E.g.* ¶ 92.)

Of course, other inferences are plausible that would explain the Individual Defendants' behavior; yet, at the motion to dismiss stage, the court considers whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Here, the inference of scienter—*i.e.*, that the Individual Defendants misrepresented the scope, business capabilities, and industry connections of the Defendants in order to enter into a partnership with Nutriband that would yield them millions of dollars in profits while keeping the most valuable part of the Agreement, the IP, for themselves—is cogent and compelling. Such a conclusion is supported by Nutriband's allegations that the Individual Defendants "never executed the required corporate documents, or undertook any measures, to transfer and assign to Nutriband their stock ownership in the

---

[5] *See supra*, Section III.A.

Corporate Defendants or the IP," and that "on or about March 9, 2018, [Kalmar] refiled the IP in his own name, for him personally and individually to own and control." (Compl. ¶¶ 68-73.) In other words, based on Nutriband's allegations, not only did the Individual Defendants misrepresent key facts about the Corporate Defendants to induce Nutriband into entering an agreement that would yield the Individual Defendants significant profits, but they also never provided to Nutriband what they had promised under the Agreement. And, given that the Individual Defendants were the highest-ranking executives of the Corporate Defendants, it would "strain[] credulity" to believe they were not involved (and aware of) these misrepresentations. *See S.E.C. v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 392 (S.D.N.Y. 2014).

The Individual Defendants argue that, to the contrary, Nutriband actually did receive both the IP and the benefit of Kalmar and Murphy's expertise in the industry. (*See* Mem. at 20.) Nutriband points to various of Nutriband's SEC filings[6] in which Nutriband announces that is has acquired the Corporate Defendants and their IP, and incorporates the acquisition into various financial statements, as evidence that "all parties believed the transaction was successfully executed in May 2017." (*Id.* at 20-21.) Yet, the complaint alleges that it was not until June 2018 that Nutriband's CEO "learned that the IP was not in Nutriband's name," that Nutriband "never became the legal owner of the Corporate Defendants," and that Kalmar had "refiled the IP in his name." (Compl. ¶¶ 68-73.) Contrary to the Individual Defendants' argument, it follows that before learning in June 2018 that the

---

[6] To support these assertions, the Individual Defendants rely on certain of Nutriband's SEC filings, which the Individual Defendants have appended as Exhibits to their motion. (*See* Nutriband Form 10-Q July 31, 2017 (Dkt. 28-60); Nutriband Form 8-K Aug. 8, 2017 (Dkt. 28-7); Nutriband Form 10-Q Oct. 31, 2017 (Dkt. 28-8); Nutriband Form 10-K Jan. 31, 2018 (Dkt. 28-9).)

Individual Defendants had not held up their end of the Agreement, Nutriband would have assumed in May 2017 that the Agreement had been executed properly. It also follows that Nutriband would not have taken issue with the Individual Defendants serving on Nutriband's board of directors after the signing of the Agreement until Nutriband discovered the fraud. The Individual Defendants argue that their service on the board in this period "negates any inference the Individual Defendants acted with a fraudulent motive for their personal gain." (Mem. at 21.)  The court disagrees; the fact that the Individual Defendants served on Nutriband's board does not address in any way: (1) the allegations that they did not provide Nutriband with the IP and stock ownership of the Corporate Defendants as required by the Agreement; (2) the allegations that, as a result of the Agreement and in spite of their noncompliance, the Individual Defendants were enriched by millions of dollars' worth of Nutriband stock; or (3) that the Individual Defendants were paradigmatic corporate insiders who would have been aware of the numerous alleged misrepresentations in the first place.

Ultimately, while the Individual Defendants' arguments potentially support an inference that no fraud occurred and that Nutriband is simply now trying to impermissibly escape an arm-length business decision it has come to regret[7], the inference that the Individual Defendants fraudulently induced Nutriband to enter the Agreement is "at least as compelling." *Tellabs*, 551 U.S. at

---

[7] This perspective, not surprisingly, is a theme running through the Individual Defendants' papers. In particular, the Individual Defendants take issue with the fact that Nutriband first sought rescission of the contract in Florida state court before filing the instant securities action in this court. (*See, e.g.*, Reply at 10.) The court takes no position on Nutriband's litigation strategy, and only addresses the narrow issue before it—whether Nutriband's complaint survives the Individual Defendants' motion to dismiss.

324. As such, the court cannot find as a matter of law that Nutriband has failed to adequately plead scienter. Therefore, the Individual Defendants' motion to dismiss Nutriband's Section 10(b) and Rule 10b-5 claims is denied.

### D. Section 20(a) Claim

Section 20(a) of the Exchange Act provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of [the 1934 Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "It is axiomatic that liability for a Section 20(a) violation is derivative of liability for a Section 10(b) violation." *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 437 (S.D.N.Y. 2014). Therefore, "[t]o establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *In re NQ Mobile, Inc. Sec. Litig.*, No. 13-CV-7608 (WHP), 2015 WL 1501461, at *2 (S.D.N.Y. Mar. 27, 2015).

Here, the Individual Defendants argue that Nutriband's Section 20(a) claim should be dismissed solely because Nutriband has failed to plead a claim under Section 10(b). (Mem. at 22.) However, because the court finds that Nutriband has adequately plead a primary violation, Nutriband has satisfied the first element of Section 20(a) liability. The court finds that the second

and third elements have likewise been met, as Nutriband has sufficiently alleged that the Individual Defendants had control of the Corporate Defendants and were "cupable participant[s]" in the Corporate Defendants' fraud. (*See* Compl. ¶¶ 97-102.) Therefore, Nutriband has stated a claim under Section 20(a) of the Exchange Act.

## IV. CONCLUSION

For the foregoing reasons, the Individual Defendants' (Dkt. 28) motion to dismiss is DENIED. The parties are DIRECTED to contact the chambers of Magistrate Judge Sanket J. Bulsara to discuss next steps in this case.


SO ORDERED.


Dated:      Brooklyn, New York
            July 20, 2020

                                        /s/ Nicholas G. Garaufis
                                        NICHOLAS G. GARAUFIS
                                        United States District Judge

29